## TAYLOR v. LIST & WEATHERBY CONST. CO., Inc., et al. †
### No. 4471.

Court of Appeal of Louisiana.
Second Circuit.

March 6, 1933.

Barnette & Roberts and Wilkinson, Lewis & Wilkinson, all of Shreveport, for appellants.

---

*Rehearing denied April 28, 1933.

† Rehearing denied March 31, 1933.

T. Overton Brooks, of Shreveport, for appellee.

DREW, Judge.

Plaintiff instituted this suit under the Workmen's Compensation Act of Louisiana (Act No. 20 of 1914, as amended) for compensation at the rate of $18.20 per week for a period not to exceed four hundred weeks, alleging total permanent disability to perform labor of any reasonable character. He alleged that the cause of his disability is an injury he received while in the employ of defendant, and that said injury was received while he was within the scope of his employment, and that it arose out of his employment. He made defendants in the case his employer, List & Weatherby Construction Company, Incorporated, and its insurer, Union Indemnity Company.

It is admitted that plaintiff was injured as alleged while acting in the scope of his employment, and that the injury arose out of his employment, and that he was paid compensation in the amount per week claimed by plaintiff for a period of eight weeks, when he was discharged as well by defendant company's physician.

The sole question before the court at this time is: Had plaintiff's ability to perform work of a reasonable character such as he was doing at the time of the injury been restored to him at the time defendant ceased to pay compensation? If not, was his disability at that time total and permanent?

Plaintiff was employed by defendant to aid in the construction of a bridge across Red river, located at the east end of Texas street, Shreveport, La. He was employed in the building of piers upon which said bridge would rest, and in sinking said piers into the bank of Red river in and under the bed of said river. Those employed in this kind of work are commonly known as "sand hogs." His work was principally done under the surface of the earth, and on the particular day he was injured he had been working seventy-five feet below the earth's surface. It is also necessary that they work under high air pressure, and on this day the pressure was thirty-nine pounds. His work required him to feed the pump that was carrying the sand and water out and to prevent large rocks and other substances from entering the pump and clogging it. A "sand hog" is only allowed to remain on the job three hours at a time and is then brought out and sent to the "hog-house" nearby where he is required to immediately take a hot shower, is given a cup of hot coffee, and required to remain in the "hog house" for one hour before leaving. The defendants kept a man in the "hog house" to see that these rules were complied with. The penalty for failure to comply with these rules was discharge.

"Sand hogs" are very subject to a condition known to the medical profession as caisson disease or "bends," which is brought about by increased air pressure, and especially when one is brought out of that high pressure too quickly. It is a condition very common to deep sea divers and others who work deep under the surface of the earth. The effect of the condition is sometimes paralysis, pains in the abdomen, legs, and muscles of the body, associated with nausea and vomiting. The physical reaction that causes the trouble is described by one of the doctors as follows:

"Q. Can you tell the court just what the chemical reaction, or just what the physical reaction, I should say, is that causes this trouble? A. While they are down there with this increased amount of pressure upon them the nitrogen is pushed out through the lung tissue into the blood stream and is carried all over the body. The body tissues can absorb or take on about thirty-five percent (35%) of nitrogen. I think the blood stream will carry about five percent (5%). This nitrogen is deposited in the tissues of the body. When this pressure is gradually released, when they come out gradually, this nitrogen from the tissue is gradually eliminated in the body just the reverse from the way it got into the body tissues. If they come out too rapidly this nitrogen in the tissues is not thrown off in the body.

"Q. What happens to it? A. Why it remains in the tissues. Say three percent (3%) to five percent (5%) remains in the tissues of this thirty-five percent (35%) that has been in there. If this breaks down it will form bubbles.

"Q. What kind of bubbles? A. Gas emboli.

"Q. In the blood or tissues? A. In the tissues.

"Q. Any in the bone? A. They say it occurs in the synovial fluid in the joints of the body.

"Q. What parts of the body are usually affected by the air bubbles in the tissues and the synovial fluid? A. In the fatty tissues, the skin—that is, under the skin; the muscles; the synovial fluid, the fluid of the joints; and the central nervous system. That is, the spinal cord and the brain.

"Q. Are the extremities affected usually, such as the legs and arms? A. Yes, they have pains in the legs and arms and sometimes paralysis. If a large embolism occurs in the spinal canal so as to cause pressure against a nerve it will cause paralysis of the lower extremities. Sometimes he will have paralysis of one side of the body.

"Q. Doctor, what physical action do these large embolisms have upon the tissues and the bones? A. What effect?

"Q. Yes. I mean by that do they have the effect of tearing up the tissues or eroding or

injuring the bone? A. Different tissues absorb more rapidly. If the blood supply to certain tissues is more profuse they absorb more rapidly to certain parts of the body than to others. I imagine that air in the muscle would be absorbed much more rapidly than in a joint where it doesn't get such an abundant blood supply. Sometimes it leaves them with paralysis and sometimes the paralysis clears up.

"Q. What reaction causes that paralysis? A. If it is a nerve paralysis I imagine it would be pressure, a certain amount of pressure upon the nerves, and scar tissue would form in there.

"Q. Is it pressure of the air bubbles upon the nerve or is it the destruction of the nerve tissue? A. I should say pressure of the air, after it has been on the nerve tissue for a certain length of time, would cause destruction of the nerve tissue."

On the day plaintiff was stricken with the "bends" he had just completed a three-hour shift and was taking a shower in the "hog house." He called out that he was stricken, and was immediately placed in a specially prepared tank kept in the "hog house" and the air pressure again increased on him. He was kept there for nearly an hour, hoping that, after recompressing him, to bring him out of it gradually and possibly relieve him. The treatment was of no avail, and he was carried to the sanitarium, in great pain, by the company's physician. He left the hospital and went to his home the next day. He remained under the treatment of the doctor for eight weeks, and was then discharged. He has continued to treat himself with hot applications, apparently the only treatment used, ever since.

He has not worked since the accident, and complains of severe pain in the shoulder and arm, and apparently cannot raise his arm higher than a horizontal position without severe pain. He carries his right shoulder low and in a drooped position, and the evidence clearly preponderates that prior to the injury he carried both shoulders erectly. He complains of severe pain when attempting to use the arm and shoulder and refused a job since the injury, due to his inability to fill it. At the time of the trial there was present an objective symptom in the drooping shoulder.

Two doctors were of the opinion that plaintiff was still suffering from the condition known as caisson disease or "bends," and is totally disabled from performing work of any reasonable character. One doctor who treated him is of the opinion that he is cured, but is not willing to say that plaintiff does not suffer the pains complained of when attempting to use his arm and shoulder.

Plaintiff's condition is a new matter for the doctors of this community. It is the first work of this kind in this locality in many years. No one of the doctors claim to have any great knowledge about it, and all testified practically from what they have gathered from the text-writers on the subject. The doctor who testified for the defendants has treated about ten men for this trouble since this particular work began, and that is the extent of his experience. Some of the men are well and some still disabled. There is very little difference in the testimony of the three doctors as to the cause of the condition and the results, or as to the treatment for the condition. The only difference of any moment in their testimony is that two are of the opinion that plaintiff is disabled and one is of the opinion he is not. To hold that plaintiff is well and able to perform work of a reasonable character would be to hold him a malingerer, and the evidence does not justify that, for the preponderance of the testimony is that he is disabled totally from performing work of any reasonable character. The lower court so found, and we find no error in his judgment.

It is therefore affirmed, with costs.

MILLS, J., recused.